# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **DARYL ADKINS, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 14 C 1456** |
| **v.** | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| **ILLINOIS BELL TELEPHONE** | ) | |
| **COMPANY d/b/a AT&T Illinois,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs bring this action against Defendant Illinois Bell Telephone Company ("Illinois Bell") alleging claims for unpaid overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et. seq.*, and the Illinois Minimum Wage Law ("IMWL"), 820 Ill. Comp. Stat. 105 *et. seq.* Presently before the Court is Illinois Bell's motion to dismiss the complaint for misjoinder and to require individual suits. For the reasons set forth below, the Court grants Illinois Bell's motion.

### RELEVANT FACTS

**I.      Background allegations**

Illinois Bell is one of the largest providers of local telephone service in Illinois and surrounding states. (R. 108, Second Am. Compl. ¶ 5.) All 82 Plaintiffs are individuals who, during the relevant time period, were employed by Illinois Bell as cable splicers. (*Id.* ¶ 6.) Within Illinois Bell, cable splicers are separated into three sub-groups: (1) copper and fiber splicers; (2) DAVAR technicians; and (3) members of the Digital Electronics Group or "DEG technicians." (*Id.* ¶ 10.) Copper and fiber splicers typically work with cable and perform work in manholes, in the air on poles, or with cable that is buried underground. (*Id.* ¶ 11.) DAVAR

technicians are responsible for verifying and testing the quality of cable pairs. (*Id.* ¶ 12.) DEG technicians install, maintain, and troubleshoot the end-user equipment that provides the services to Illinois Bell's customers. (*Id.* ¶ 13.) The 82 Plaintiffs involved in this case have worked as various types of cable splicers, been assigned to at least 48 different garages, and have worked underneath approximately 160 supervisors, all over different time periods. (R. 116, Def.'s Mem. at 2.)

All cable splicers start and finish their workday at an assigned garage, where they pick up and return assignments, resources (blueprints, materials, and supplies), tools, equipment, and Illinois Bell trucks. (R. 108, Second Am. Compl. ¶ 17.) Despite beginning and ending their workday at the garage, Illinois Bell does not require cable splicers to punch a time clock. (*Id.* ¶ 18.) Rather, Illinois Bell requires cable splicers to report their daily time worked by recording the code for the multiple discrete tasks they individually performed each day. (*Id.* ¶ 19.) In or about December 2009, cable splicers began recording the time they spent on particular tasks in an electronic system called Job Administration Management ("JAM"). (*Id.* ¶ 37.) Each discrete task is given a code to which there is assigned a certain predetermined time increment; all cable splicers are expected to perform their given tasks within these predetermined time increments. (*Id.* ¶ 20.) Cable splicers are given an "efficiency rating," which is calculated based on how well they perform their tasks for the day within the time increments set by the task codes. (*Id.*) This efficiency rating is calculated using a system called Management Systems Operations Control ("MSOC"), which Illinois Bell has been using since February 2010. (*Id.* ¶ 35.) Plaintiffs allege that they may be subject to disciplinary measures if they cannot perform their tasks within the time standards set by MSOC. (*Id.*)

Illinois Bell has a uniform policy requiring cable splicers to be en route from their assigned garage to their first job within a specified period of time after the start of their shifts. (*Id.* ¶ 24.) Before leaving their garages for job sites, cable splicers are expected to participate in a tailgate meeting, discuss jobs with supervisors, review the blueprints for their job assignments, stock their trucks, get all the materials needed for the job, and perform other work-related activities. (*Id.* ¶ 23.) Plaintiffs allege that often there is not enough time to complete the required start-of-shift activities prior to the time they are expected to depart for their job sites. (*Id.* ¶ 24.) Plaintiffs allege that they therefore often perform these start-of-shift tasks "off-the-clock," before the start of their shifts and while under the supervision of Illinois Bell supervisors. (*Id.*)

Illinois Bell has uniform meal period policies. (*Id.* ¶ 27.) When a cable splicer is working underground, these policies provide that: (1) he may not tear down that work location to travel for lunch; (2) the location cannot be left unattended; and (3) he is expected to bring his lunch with him to the location and eat it there. (*Id.* ¶ 28.) All cable splicers are responsible for the equipment used at a job site and ensuring that no equipment is stolen or damaged; if equipment is stolen or damaged, Plaintiffs allege that they are subject to discipline. (*Id.* ¶ 29.) Additionally, all cable splicers are held accountable for maintaining and monitoring worker safety, as well as the safety of the public at all times for their job sites. (*Id.* ¶ 30.) Plaintiffs allege that they are expected by many of their supervisors to work through their meal period and to eat their lunch "on the job" in order to meet the efficiency standards imposed by MSOC. (*Id.* ¶ 25.)

Illinois Bell also has a uniform policy requiring cable splicers to return to their garage no more than 20 minutes before their scheduled end-of-shift. (*Id.* ¶ 31.) Cable splicers are expected

to complete numerous activities after they return to the garage such as recording task time, cleaning and restocking their trucks, and ordering supplies. (*Id.* ¶ 32.) Plaintiffs allege that 20 minutes is often not enough time to complete these tasks, and therefore they work "off-the-clock" after their shift ends. (*Id.*)

## II.     The *Blakes* action

The 82 Plaintiffs in this case are also members of a collective action currently pending in this District. *See Blakes v. Ill. Bell Tel. Co.*, No. 11 CV 336 (N.D. Ill. filed Jan. 17, 2011) (Kim, J.) (the "*Blakes* action"). In the *Blakes* action, seven named plaintiffs brought a collective action against Illinois Bell under the FLSA, alleging unpaid overtime wages. *Blakes v. Ill. Bell Tel. Co.*, No. 11 CV 336, 2013 WL 6662831, at *1 (N.D. Ill. Dec. 17, 2013). On June 15, 2011, Judge Kim granted conditional certification under the "lenient" first-stage standard, finding that the plaintiffs made the "modest factual showing" of similarity for three theories: (1) that cable splicers work through lunch because of Illinois Bell's policy requiring them to maintain the security of their job sites; (2) that cable splicers miss lunch because of inter-site travel; and (3) that cable splicers are forced to work past the end of their shifts to complete time sheets. *Id.* at *2, *4. Following Judge Kim's conditional certification order, the named plaintiffs issued notice of the suit to more than 2,000 potential opt-in plaintiffs; ultimately 346 current and former cable splicers opted in to the lawsuit. *Id.*

After extensive discovery, including depositions of 18 opt-in plaintiffs (11 of whom were original plaintiffs here, 9 of whom remain), Illinois Bell moved to decertify the collective action. *Id.* Illinois Bell highlighted the variations in the plaintiffs' experiences by job, location, and supervisor to show that the plaintiffs were not similarly situated. *Id.* Illinois Bell argued that the plaintiffs' experiences in working through lunch or before or after their shifts were so varied that

individualized inquiries inevitably would outweigh any efficiency benefits that could be gained by pursuing the case as a collective action. *Id.* at *4. In response, the plaintiffs argued for certification under a new theory: the "efficiency-pressure" theory. *Id.* at *5. The plaintiffs asserted that they uniformly underreport the time it takes them to complete their daily tasks in order to avoid being disciplined for failing to meet what they characterized as impossible efficiency goals. *Id.* The plaintiffs also proposed that as an alternative to all opt-in cable splicers pursing their efficiency-pressure theory as an entire collective, the court could divide them into three sub-classes—cable and fiber splicers, DAG technicians, and DAVAR technicians—to address alleged FLSA violations stemming from policies that are specific to each of those groups. *Id.* at *16.

On December 17, 2013, Judge Kim decertified the collective action on all but the plaintiffs' post-shift time sheet entry claim.[1] *Id.* at *21. Although Judge Kim concluded that the plaintiffs' efficiency-pressure theory offered to avoid decertification was procedurally barred because the plaintiffs had not presented this theory at the conditional certification stage, he nevertheless went on to reject this theory of similarity on its merits. *Id.* at *9-*16. The plaintiffs' argued that the MSOC and JAM systems represented a "common policy" that connected the plaintiffs and rendered them similarly situated to justify collective treatment. *Id.* at *10. Judge Kim, however, disagreed. *Id.* at *12. He determined that the differences in the opt-in plaintiffs' testimony demonstrated that "it would be impossible to resolve the question of

---

[1] At the decertification stage, Judge Kim considered the following factors to determine whether the plaintiffs were "similarly situated" and thus amenable to collective treatment under Section 216(b) of the FLSA: "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Blakes*, 2013 WL 6662831, at *9 (quoting *Strait v. Belcan Eng'g Grp., Inc.*, 911 F. Supp. 2d 709, 718 (N.D. Ill. 2012)).

whether the combination of the MSOC and JAM rating systems compelled cable splicers to work off the clock on a classwide basis." *Id.* Judge Kim explained that "[t]he testimony reveals that whether and when cable splicers hid time from the JAM system turned on their daily assignments, their own past performance statistics, and their personal tolerance for the risk of falling into the bottom efficiency quintile." *Id.* Because the evidence suggested that the only way to "get to the bottom of whether cable splicers routinely hid time" to improve their MSOC efficiency ratings "would require hundreds of individualized inquiries into the plaintiffs' particular circumstances," Judge Kim concluded that "the plaintiffs' efficiency-pressure theory simply [did] not support continued collective treatment[.]" *Id.* Judge Kim thus found that "the plaintiffs [had] not made a sufficient second-stage showing that any common policy connects the cable splicers who opted into the collective in a way that renders them similarly situated." *Id.* at *13.

Judge Kim also held that "the plaintiffs [had] not met their burden of showing that the members of the proposed sub-classes are similarly situated with respect to Illinois Bell's policies requiring cable splicers to maintain the security of their assigned job sites and to leave from and return to their garages at a specified time." *Id.* at *16. For all three sub-classes, the plaintiffs again relied on the premise that they routinely hid the fact that they had not taken a lunch break, or had worked pre- or post-shift, to improve their efficiency ratings. *Id.* at *17-18. Judge Kim explained that "even when the cable splicers are divided into smaller classes based on the functions they perform, the trier of fact would still have to analyze individual questions related to the plaintiffs' particular responses to alleged MSOC efficiency pressure in order to resolve their FLSA claims." *Id.* at *17. Therefore, Judge Kim concluded that "the same individual variations

that preclude collective treatment of the class of opt-in cable splicers as a whole precludes a finding of the requisite degree of similarity among opt-in plaintiffs in each sub-class." *Id.*

Judge Kim found that "the only aspect of the case that appear[ed] to have legs independent of the idea that MSOC forces cable splicers to hide time" was the plaintiffs' claim that they were required to complete time sheets post-shift without pay. *Id.* at *19. The plaintiffs argued that Illinois Bell's policy requiring cable splicers to return to their garage by 3:10 p.m. routinely resulted in unpaid time spent to complete their JAM paperwork because 20 minutes was not enough time to complete their end-of-shift tasks and fill out their timesheets. *Id.* Judge Kim agreed, finding that there were "sufficient parallels among the plaintiffs' experience of working post-shift to support a finding of similarity with respect to this aspect of their claim." *Id.* Judge Kim explained that "[d]etermining whether that 20–minute period is sufficient is an objective inquiry untied to any questions about individual desires to pad efficiency statistics or other subjective motivations." *Id.* He emphasized that there was a significant amount of evidence showing that computer shortages or glitches often prevented cable splicers from completing their time sheets in the 20-minute window. *Id.* He also noted that there was evidence showing that some cable splicers were told by Illinois Bell management not to report time spent completing JAM paperwork off-the-clock. *Id.* Judge Kim thus held that "[b]ecause the submitted evidence create[d] a record suggesting that the plaintiffs uniformly experienced difficulty getting through the expected tasks between 3:10 and 3:30 p.m., the question whether that time period is sufficient is one that can be answered on a collective basis." *Id.*

Accordingly, the *Blakes* named plaintiffs are currently before Judge Kim with a collective action for their post-shift time sheet entry claim and with individual actions joined together for their other off-the-clock work claims. (R. 122, Pls.' Resp. at 2.)

## PROCEDURAL HISTORY

On February 28, 2014, when Judge Kim's decertification decision took effect in the

*Blakes* action, the same plaintiffs' counsel filed this lawsuit on behalf of 141 *Blakes* opt-in

Plaintiffs. (R. 1, Compl.) Plaintiffs' counsel amended the complaint on March 5, 2014. (R. 8,

Am. Compl.) The amended complaint indicated that Plaintiffs "are seeking to assert those

claims that were not certified to go forward on a collective basis in" the *Blakes* action. (*Id.* at ¶

3.) Thereafter, 52 of the 141 individual Plaintiffs voluntarily dismissed their claims. (R. 116,

Def.'s Mem. at 6.) The remaining Plaintiffs are now represented by five different law firms.

(*Id.*)

The 89 remaining Plaintiffs filed a second amended complaint on July 30, 2014. (R. 108,

Second Am. Compl.) The 178-page, 1,318-paragraph second amended complaint asserts 127

counts. (*Id.*) Counts 1-81 are brought on behalf of individual Plaintiffs for violations of the

FLSA—the second amended complaint alleges that Illinois Bell failed to pay sufficient overtime

compensation for work that allegedly occurred, depending on the individual Plaintiff, pre-shift,

post-shift, or during lunch breaks. (*Id.* at ¶¶ 43-1178.) Counts 82-126 are brought on behalf of

individual Plaintiffs for violations of the IMWL. (*Id.* ¶¶ 1179-314.) The last count is brought on

behalf of eight Plaintiffs for violations of the FLSA—counsel had been unable to communicate

with these eight Plaintiffs before filing the second amended complaint. (*Id.* ¶¶ 1315-18.) Since

the filing of the second amended complaint, seven of those eight Plaintiffs have voluntarily

dismissed their claims. A total of 82 Plaintiffs therefore remain in this lawsuit.

On August 29, 2014, Illinois Bell moved to dismiss the second amended complaint for

misjoinder and requested that the Court require individual suits. (R. 115, Def.'s Mot.) Plaintiffs

responded to Illinois Bell's motion on September 23, 2014, (R. 122, Pls.' Resp.), and Illinois Bell replied on October 6, 2014, (R. 132, Def.'s Reply).

## LEGAL STANDARD

Under Rule 20(a), multiple plaintiffs may be joined in one action if: (1) the plaintiffs assert claims "arising out of the same transaction, occurrence, or series of transactions or occurrences," and (2) "any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1). In addition to the two requirements of Rule 20(a)(1), the Court may also consider whether joinder would prejudice any party or result in needless delay. *See Chavez v. Ill. State Police*, 251 F.3d 612, 632 (7th Cir. 2001). The Supreme Court has instructed that "[u]nder the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties, and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966).

Where parties fail to satisfy either of the requirements for permissive joinder under Rule 20(a), misjoinder occurs. *Bailey v. N. Trust Co.*, 196 F.R.D. 513, 515 (N.D. Ill. 2000). Under Rule 21, a court may not dismiss an action for misjoinder but may sever a misjoined claim or a party at any time during a lawsuit. Fed. R. Civ. P. 21. "Even if plaintiffs satisfy the requirements for permissive joinder under Rule 20(a), the court has discretion to sever a party at any time [] if doing so will increase judicial economy and avoid prejudice to the litigants." *Robinson v. Dart*, No. 13 C 1502, 2014 WL 222711, at *3 (N.D. Ill. Jan. 21, 2014) (citation and internal quotation marks omitted); *see also Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1016 (7th Cir. 2000) ("It is within the district court's broad discretion whether to sever a claim under Rule 21.").

## ANALYSIS

**I.      Whether Judge Kim's decertification decision in the *Blakes* action bars joinder**

Illinois Bell first argues that Judge Kim's decertification decision in the *Blakes* action

bars joinder of Plaintiffs' claims here. (R. 116, Def.'s Mem. at 7.)  Specifically, Illinois Bell

argues that a finding of misjoinder is warranted under the principle of collateral estoppel. (*Id.* at

8-10.)  According to Illinois Bell, Plaintiffs are estopped from proceeding jointly because Judge

Kim already found that Plaintiffs are not similarly situated and that their claims are not suitable

for collective treatment. (*Id.* at 7-10.)

Under the doctrine of collateral estoppel (or issue preclusion), a party is estopped from

relitigating an issue if: "(1) the issue sought to be precluded is the same as that involved in a

prior action; (2) the issue was actually litigated; (3) the determination of the issue was essential

to the final judgment; and (4) the party against whom estoppel is invoked was represented in the

prior action." *Adair v. Sherman*, 230 F.3d 890, 893 (7th Cir. 2000).

The Court first analyzes whether Judge Kim's ruling addressed the joinder issue in this

case.  In order to be joined under Rule 20(a), Plaintiffs' claims must arise "out of the same

transaction, occurrence, or series of transactions or occurrences." Fed. R. Civ. P. 20(a)(1)(A).

Illinois Bell argues that Judge Kim's ruling that Plaintiffs are not similarly situated under Section

216(b) of the FLSA necessarily means that Plaintiffs cannot satisfy this Rule 20 joinder

requirement. (R. 116, Def.'s Mem. at 9.)  While the Seventh Circuit has not resolved whether

the Rule 20 standard and the FLSA Section 216(b) standard are comparable, other courts have

addressed this issue.  The Eleventh Circuit has held that "the 'similarly situated' requirement of

[FLSA] § 216(b) is more elastic and less stringent than the requirements found in Rule 20

(joinder) and Rule [21] (severance)." *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir.

1996). Courts in this District and elsewhere have followed the Eleventh Circuit's reasoning. *See Molina v. First Line Solutions, L.L.C.*, 566 F. Supp. 2d 770, 786-87 (N.D. Ill. 2007) ("To proceed on a § 216(b) collective action, there must be similarly situated employees, which includes being subjected to a common policy. This standard has been held to be less stringent than that required for joinder of parties under [Rule] 20(a)[.]"); *Mahaffey v. Amoco Corp.*, No. 93 C 4587, 1997 WL 24712, at *1 (N.D. Ill. Jan. 17, 1997) ("To proceed as a representative action under [FLSA Section 216(b)], plaintiffs need only show that they are "similarly situated," and not that their claims arose out of the same transaction or occurrence as required under [Rule] 20(a), or that they meet Rule 23(a) class action prerequisites."); *see also Yerger v. Liberty Mut. Grp.*, No. 5:11-CV-238-D, 2012 WL 4423499, at *3 (E.D.N.C. Sept. 24, 2012) ("Section 216(b)'s standard . . . is more lenient than Rule 20's. Thus, if a plaintiff fails to meet section 216(b)'s flexible, elastic standard as to a class of individuals, the plaintiff necessarily fails to satisfy Rule 20's stricter standard as to any individual in that class." (internal citations omitted)); *Flavel v. Svedala Indus., Inc.*, 875 F. Supp. 550, 553 (E.D. Wis. 1994) (same).

Judge Kim comprehensively analyzed Plaintiffs' contention that the MSOC and JAM systems represented a "common policy" that rendered them similarly situated, and he determined that the variations in the opt-in plaintiffs' testimony "demonstrate[d] that pressure stemming from MSOC impacted cable splicers in different ways on different days and sometimes not at all." *Blakes*, 2013 WL 6662831, at *10. Because of the need for an "overwhelming amount of individual inquires" to determine whether and when Plaintiffs hid their time, Judge Kim concluded that the MSOC system "did not establish that [Plaintiffs] are sufficiently similar to justify the continued collective treatment of their claim." *Id.* at *10-*12. This Court honors Judge Kim's ruling and therefore finds that because Plaintiffs could not satisfy the similarly

situated standard under FLSA Section 216(b) with respect to this particular claim, they necessarily cannot meet Rule 20(a)'s joinder requirement. *See Grayson*, 79 F.3d at 1096; *Yerger*, 2012 WL 4423499, at *3 (declining to join four employees to the plaintiff's complaint because the court had already found that the plaintiff failed Section 216(b)'s similarly situated standard as to all other employees). Thus, Judge Kim's ruling necessarily resolved the issue Illinois Bell seeks to preclude here—whether Plaintiffs' claims arise out of the same series of transactions—and therefore the first factor for collateral estoppel is satisfied.

The remaining factors for collateral estoppel are also satisfied. Judge Kim's order reveals that this similarity issue was "actually litigated" as the parties conducted extensive discovery on the issue, hired multiple experts, and filed hundreds of pages of briefing on decertification. Additionally, the determination of whether Plaintiff's claims were sufficiently similar was essential to Judge Kim's decision to partially decertify the FLSA collective action. Finally, the Plaintiffs were opt-in plaintiffs in the *Blakes* action and were represented by the same counsel who initiated this lawsuit. Accordingly, the Court finds that Plaintiffs are collaterally estopped from joining all 82 individual Plaintiffs into one action under Rule 20 based on their efficiency-pressure theory. *See Faison v. Tex. EZPawn*, No. G-07-067, 2007 WL 1428639, at *1-*2 (S.D. Tex. May 11, 2007) (finding that collateral estoppel precluded Rule 20 joinder of 42 plaintiffs after FLSA decertification, as prior judge "clearly already ruled on the commonality factor [under FLSA Section 216] using language that is identical to the commonality requirement for Rule 20 joinder, and this Court honors that ruling").

At the decertification stage in the *Blakes* action, the Plaintiffs offered their efficiency-pressure theory as the primary reason they worked off-the-clock. Therefore, Judge Kim only found that Plaintiffs were not similarly situated based on this theory. His ruling on Plaintiffs'

similarity is thus limited to this particular claim. Here, however, Plaintiffs appear to be alleging

in the second amended complaint different reasons for underreporting their time. Specifically, in

addition to alleging that the MSOC system caused Plaintiffs to hide time, some Plaintiffs also

appear to be alleging that they underreported their time because supervisors told them not to

report the time they worked pre- and post-shift or during lunch. Because Judge Kim did not

make a finding relating to this theory of similarity, collateral estoppel does not apply. Therefore,

the Court must determine whether Plaintiffs' new allegations in the second amended complaint

meet the requirements of joinder under Rule 20.

## II. Whether Plaintiffs' claims are misjoined

### A. Whether Plaintiffs' claims arise out of the same transaction, occurrence, or series of transactions or occurrences

Illinois Bell argues that Plaintiffs' claims do not arise from "the same transaction,

occurrence, or series of transactions or occurrences" under Rule 20(a)(1) because "each plaintiff

has a different story to tell." (R. 116, Def.'s Mem. at 11.) Illinois Bell emphasizes that "nearly

every plaintiff allegedly reported to two or more supervisors" and "worked out of two or more

garages," and that Plaintiffs "assert a hodgepodge of allegedly unpaid tasks occurring at different

times throughout a given day." (*Id.*) Plaintiffs counter that while Illinois Bell "asks the Court to

interpret the series of transactions as narrowly as possibly restricting each claim to each

Plaintiff," they "ask for a more logical association." (R. 122, Pls.' Resp. at 11.) According to

Plaintiffs, they are similar because Illinois Bell's "common timekeeping and payroll systems

failed to record or pay for Plaintiffs' off-the-clock work," and because Illinois Bell's "managers

ignored, or failed to accurately monitor, Plaintiffs' work time."[2] (*Id.*)

---

[2] In their response brief, Plaintiffs only argue that their "lunchtime and pre-shift claims arise out of the same series of transactions." (R. 122, Pls.' Resp. at 10.) Plaintiffs do not argue that their

"In ascertaining whether a particular factual situation constitutes a single transaction or occurrence for purposes of Rule 20, a case-by-case approach is generally pursued because no hard and fast rules have been established." *Bailey*, 196 F.R.D. at 515; *see also Martinez v. Haleas*, No. 07 C 6112, 2010 WL 1337555, at *3 (N.D. Ill. Mar. 30, 2010). "Although 'transaction or occurrence' is not defined in Rule 20(a), courts interpret this term as 'comprehend[ing] a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.'" *Lozada v. City of Chi.*, No. 10 C 1019, 2010 WL 3487952, at *2 (N.D. Ill. Aug. 30, 2010) (quoting *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974)); *see also Malibu Media, L.L.C. v. Reynolds*, No. 12 C 6672, 2013 WL 870618, at *8 (N.D. Ill. Mar. 7, 2013). Courts determine the logical relatedness of separate occurrences by considering a variety of factors, including "whether the alleged conduct occurred during the same general time period, involved the same people and similar conduct, and implicated a system of decision-making or widely-held policy[.]" *Lozada*, 2010 WL 3487952, at *2 (citations and internal quotation marks omitted); *see also Berry v. Ill. Dep't of Human Servs.*, No. 00 C 5538, 2001 WL 111035, at *17 (N.D. Ill. Feb. 2, 2001) (considering factors such as "whether the same supervisors were involved, whether employees worked in the same department, whether employees were at different geographical locations, and whether a company-wide policy is alleged"). "When the plaintiffs' claims require individual fact finding and discovery, different witnesses and testimony, and separate questions to answer, they

---

post-shift claims arise out of the same series of transactions, and thus the Court presumes that they are not seeking joinder of these claims. In fact, Plaintiffs appear to be under the impression that the *Blakes* action covers all their post-shift claims. (*See id.* at 2, 5, 10.) However, Judge Kim only certified the Plaintiffs' post-shift time sheet entry claim. *Blakes*, 2013 WL 6662831, at *19-*21. In the second amended complaint, Plaintiffs allege that they worked off-the-clock post-shift completing a large array of tasks in addition to filling out their time sheets. Even though Plaintiffs do not appear to be arguing that these post-shift claims should be joined, for the sake of completeness the Court will include these post-shift claims in its joinder analysis.

generally do not constitute [the] same transaction or occurrence and cannot be joined." *Robinson*, 2014 WL 222711, at *2 (citation and internal quotation marks and alteration omitted).

Here, the 82 Plaintiffs are all current or former employees who worked for Illinois Bell during various time periods—some started working there as early as January 1979, (R. 108, Second Am. Compl. ¶ 1061), and some ended their employment as early as June 2009, (*id.* ¶ 633). Plaintiffs have worked as one or more of the three subsets of cable splicers—copper and fiber, DAVAR technicians, and DEG technicians—performing different responsibilities in different work environments. (*Id.* ¶¶ 10-13.) In total, Plaintiffs have worked in at least 48 different garages, under more than 160 supervisors. Some of the Plaintiffs worked in only one garage, (*see, e.g., id.* ¶¶ 133, 360, 1089), while others worked in as many as five garages, (*see, e.g., id.* ¶¶ 87, 229, 1123). Nearly every Plaintiff reported to two or more supervisors, with several having as many as six to nine supervisors. (*See, e.g., id.* ¶¶ 375, 427, 649.)

All but three of the 82 Plaintiffs allege that they performed unpaid work pre-shift. While Plaintiffs make the general allegation that the allotted time to complete their start-of-shift activities is not sufficient, (*id.* ¶ 24), the tasks they allege they performed off-the-clock pre-shift vary greatly. The tasks the individual Plaintiffs allege range from stocking their trucks, (*see, e.g., id.* ¶¶ 75, 245, 294), to talking with supervisors or other technicians about jobs, (*see, e.g., id.* ¶¶ 62, 167, 272), to checking e-mail and filling out timesheets, (*see, e.g., id.* ¶¶ 283, 335, 662). The same variety exists for the tasks Plaintiffs allege they had to perform off-the-clock post-shift because they allegedly could not complete their end-of-shift activities in the 20-minute allotted time period. These tasks range from ordering supplies, (*see, e.g., id.* ¶ 336), to cleaning out their trucks and disposing of used cable, (*see, e.g., id.* 76, 144, 232), to filling out timesheets and paperwork, (*see, e.g., id.* ¶¶ 377, 1150). Ten of the Plaintiffs do not allege that they completed

any tasks off-the-clock post-shift. Further, all Plaintiffs allege that they worked through lunch or took a short lunch, but the reasons they did so also vary. Some allege that they ate at their job sites to monitor equipment or maintain site safety, (*see, e.g., id.* ¶¶ 145, 181, 285, 321, 995), others allege that they ate while driving between job sites, (*see, e.g.,* id. ¶¶ 247, 261), and others allege that they worked through lunch to meet their efficiency expectations, (*see, e.g., id.* ¶¶ 337, 389, 706, 746).

Due to these myriad factual variations underlying Plaintiffs' unpaid overtime claims, it is difficult for the Court to conclude that their claims arise out of the same transaction, occurrence, or series of transactions or occurrences. Courts have declined to join plaintiffs where the individual circumstances of each plaintiff varied like they do here. *See Berry*, 2001 WL 111035, at *17 (declining to join the discrimination claims of 33 plaintiffs in a single lawsuit because the plaintiffs were employed at six different facilities, had different supervisors, and made no specific allegation of a company-wide policy); *Bailey*, 196 F.R.D. at 516-17 (severing the claims of five employees who worked in the same department but experienced discrimination from different team leaders and section managers at different times over a fifteen-month period); *see also Gregory v. FedEx Ground Package Sys., Inc.*, No. 2:10cv630, 2012 WL 2396873, at *10 (E.D. Va. May 9, 2012) (severing the FLSA overtime claims of 10 plaintiffs who worked at different times and in separate locations because "[a]lthough common issues of law pervade Plaintiffs' complaint, the factual dissimilarities are myriad, and the Court is reluctant to conclude that Plaintiffs['] claims arose out of the same transaction or occurrence or series of transactions or occurrences for every plaintiff"); *Gatewood v. Koch Foods of Miss., LLC*, No. 3:07CV82-KS-MTP, 2009 WL 8642001, at *21 (S.D. Miss. Oct. 20, 2009) (decertifying the collective action and then severing the five named plaintiffs' FLSA claims because the plaintiffs "were subject to

different compensation practices of different supervisors in different locations and [] any potential common questions of law or fact will pale in comparison to the particularized, individual inquiries that will be required to prove each of the named plaintiffs' claims").

Plaintiffs argue that the Court should look beyond these factual variations and instead make "a more logical association." (R. 122, Pls.' Resp. at 11.) Plaintiffs' highlight Illinois Bell's "common timekeeping and payroll systems [that] failed to record or pay for Plaintiffs' off-the-clock work" to support their theory that all of the Plaintiffs' claims arise out of the same series of transactions. (*Id.*) However, Plaintiffs allege in the second amended complaint that different timekeeping systems applied over the relevant time period—the JAM timekeeping system was not implemented until December 2009, and the MSOC system was not implemented until February 2010. (R. 108, Second Am. Compl. ¶¶ 34-38.) Thus, not all Plaintiffs were subject to the same systems, as some plaintiffs terminated their employment with Illinois Bell before the systems went into effect. Additionally, as explained above, Judge Kim has already found that the MSOC and JAM systems do not make Plaintiffs similarly situated. *Blakes*, 2013 WL 6662831, at *12. Judge Kim explained that several Illinois Bell policies "officially reinforce the idea that cable splicers are required to report when they work through lunch or before or after a shift, regardless of whether they have received preapproval." *Id.* at *3. The *Blakes* plaintiffs did not argue that Illinois Bell refused to pay them when they reported working overtime; in fact, many of the deposed plaintiffs acknowledged that when they reported overtime work, Illinois Bell paid them for it. *Id.* at *10, *17. Instead, the plaintiffs argued that they underreported their time to improve their efficiency ratings, and Judge Kim found this theory unsuitable for collective treatment because "whether a cable splicer underreported time depended on a whole host of individual circumstances that varied by day." *Id.* *13. Just as Judge Kim found that the

MSOC and JAM systems did not render the plaintiffs similarly situated, this Court concludes that the timekeeping systems do not make Plaintiffs' claims arise out of the same series of transactions. *See Gregory*, 2012 WL 2396873, at *13 (refusing to join Plaintiffs' FLSA claims based on the plaintiffs' argument that the defendant "committed the alleged FLSA violations as part of a pattern or practice of not logging their hours" because "plaintiffs will have to put forth individualized proof that they worked hours for which they did not receive compensation").

Plaintiffs also argue that their claims arise out of the same series of transactions because Illinois Bell's "managers ignored, or failed to accurately monitor, Plaintiffs' work time." (R. 122, Pls.' Resp. at 11.) Yet in the second amended complaint, not all Plaintiffs make this allegation. As to their lunchtime work claims, some Plaintiffs allege that they "informed [their] supervisor that [they] worked through lunch and the supervisor told [them] that [they] would not be paid for that time," (*see, e.g.*, R. 108, Second Am. Compl. ¶¶ 54, 148, 208, 367, 441, 615), others allege that their "supervisors pressured [them] to work through [their] unpaid meal break to ensure that [they] met [their] efficiency goals," (*see, e.g., id.* ¶¶ 909, 923, 940, 964, 1018), and others allege that Illinois Bell failed to inform [them] of a method to report working through lunch," (*see, e.g., id.* ¶¶ 66, 78, 92, 103, 115). However, several Plaintiffs fail to allege anything regarding the extent of their supervisors' knowledge of their unpaid lunchtime work. (*See, e.g., id.* ¶¶ 252-264, 328-340, 421-430, 443-452, 466-475, 543-554, 580-589, 1167-1178.) As to unpaid work pre- and post-shift, some Plaintiffs allege that their supervisors saw plaintiffs working before the start of their shifts, (*see, e.g., id.* ¶¶ 143, 275, 325, 418), and/or after their shifts ended, (*see, e.g., id.* ¶¶ 80, 104, 325); while others allege that their supervisors explicitly told them that they would not be paid for work that they did before shift, (*see, e.g., id.* ¶¶ 338, 640, 653, 665), and/or after shift, (*see, e.g., id.* ¶¶ 352, 339, 366, 391, 464). However, some

plaintiffs fail to allege anything regarding the extent of their supervisors' knowledge of their unpaid work pre- or post-shift. (*See, e.g., id.* ¶¶ 302-312; 421-430, 443-452, 466-475, 580-589, 1167-1178.)

Even if all the Plaintiffs had alleged that their supervisors were aware of their unpaid overtime work, the Court would still need to engage in numerous individual inquiries to determine the extent of each supervisor's knowledge and assess each supervisor's decision to require off-the-clock work. *See McDowell v. Morgan Stanley & Co., Inc.*, 645 F. Supp. 2d 690, 695 (N.D. Ill. 2009) (severing the plaintiffs' claims because "[t]hough [the defendant's] alleged discriminatory conduct may have occurred because of a company-wide policy, that conduct was rooted in individual decisions, made by different supervisors, at different times, and in four different offices"). Further, Plaintiffs do not allege that Illinois Bell had any type of written or unspoken illegal policy requiring its supervisors to encourage cable splicers to work off-the-clock without pay. *See Bailey*, 196 F.R.D. at 516 (declining to join plaintiffs' claims "because their claims do not allege any general discriminatory or illegal standard, policy or procedure" of the defendant or "claim that the alleged discrimination occurred as a result of a singular policy"). In fact, as explained above, Judge Kim noted that Illinois Bell's written policies indicate that all overtime hours reported by employees will be paid, regardless of whether the employee received preapproval to work overtime. *Blakes*, 2013 WL 6662831, at *3. Thus, individual inquiries will need to be conducted to determine whether Illinois Bell was aware that its supervisors were allowing and/or requiring Plaintiffs to work unpaid overtime. *See Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) ("the FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about").

Because Plaintiffs claims will "require individual fact finding and discovery, different witnesses and testimony, and separate questions to answer," the Court finds that their claims do not arise out of the same transaction, occurrence, or series of transactions or occurrences. *See Robinson*, 2014 WL 222711, at *2.

### B.     Whether there are common questions of law or fact

The second requirement of Rule 20(a) is that common questions of law or fact must exist among the plaintiffs' claims. Fed. R. Civ. P. 20(a)(1)(B). Both requirements of Rule 20 need to be satisfied to join Plaintiffs' claims. *See* Fed. R. Civ. P. 20(a); *Bailey*, 196 F.R.D. at 515. Thus, because Plaintiffs did not satisfy the first requirement, the Court need not engage in an analysis of the second requirement. *See Ramos v. Playtex Prods., Inc.*, No. 08 CV 2703, 2008 WL 4066250, at *4 (N.D. Ill. Aug. 27, 2008) ("Because plaintiffs' claims against the different defendants fail to satisfy the same transaction or occurrence requirement, joinder of these claims is improper regardless of whether plaintiffs have satisfied the further requirement of Rule 20(a)(2) that their claims involve a common question of fact or law.").

Accordingly, because Plaintiffs' claims do not arise out of the same transaction, occurrence, or series of transactions or occurrences for purposes of Rule 20(a), the Court finds that Plaintiffs' claims are misjoined and must be severed pursuant to Rule 21.

### C.     Whether severance will increase judicial economy and avoid prejudice

Even if Plaintiffs had satisfied the requirements for joinder, the Court could nevertheless sever their claims "if doing so will increase judicial economy and avoid prejudice to the litigants." *Robinson*, 2014 WL 222711, at *3 (citation omitted); *see also Chavez*, 251 F.3d at 632 (finding that district court has discretion to decline to join plaintiffs' claims if joinder would create "prejudice, expense or delay" (citation omitted)). Plaintiffs devote a large portion of their

response brief to arguing for joinder based on judicial economy grounds. Specifically, Plaintiffs argue that requiring each of them to file an individual suit will "increase the cost of resolving this dispute and delay full resolution with repetitive pleadings, rulings, and depositions. (R. 122, Pls.' Resp. at 6.)

The Court agrees with Illinois Bell, however, that the judicial economy considerations weigh in favor of severing Plaintiffs' claims. First, the Court notes that joinder of more than 40 plaintiffs is generally considered impracticable. *See Pawelcazka v. Fin. Recovery Servs., Inc.*, 286 F.R.D. 381, 385 (N.D. Ill. 2012); *Hale v. AFNI, Inc.*, 264 F.R.D. 402, 404 (N.D. Ill. 2009). Next, the Court agrees with Illinois Bell's argument that dealing with the five independent law firms that currently represent different groups of Plaintiffs could make depositions and document production more cumbersome, as well as complicate protective orders and routine motion practice. (R. 122, Def.'s Mem. at 14.) Additionally, the Court considers the prejudice that Illinois Bell faces should Plaintiffs' claims be tried together before a single jury; Illinois Bell's right to defend against each claim may be comprised. *See McDowell*, 645 F. Supp. 2d at 696 (recognizing that "should [plaintiffs'] claims be tried together, before a single jury, the risk of confusion, prejudice, overlapping proof and duplicative testimony would be substantially increased, given the differences between each of the Plaintiffs' situations"); *Bailey*, 196 F.R.D. at 518 (concluding that if a joint trial were allowed, there would be "tremendous danger that one or two plaintiff's unique circumstances could bias the jury against defendant generally, thus prejudicing defendant with respect to the other plaintiffs' claims").

Plaintiffs assert that their claims should remain joined so that they can proceed with joint discovery. (R. 122, Pls.' Resp. at 8.) They argue that severing Plaintiffs' claims will require the supervisors "to testify at multiple separate depositions rather than just one deposition for all of

the Plaintiffs they supervised." (*Id.* at 7.) Yet, as Plaintiffs point out, most managers did not supervise more than three or four of the Plaintiffs, (*id.* at 6), and thus a majority of the supervisors will not have to testify at multiple depositions. Additionally, the Court agrees with Illinois Bell that "Plaintiffs' claims require individualized, plaintiff-specific testimony from each supervisor at each deposition that cannot be handled by a single, omnibus deposition," (R. 132, Def.'s Reply at 12), and therefore any benefit of joint discovery is minimal. Further, severing Plaintiffs' claims does not mean that they cannot coordinate discovery. *See Gregory*, 2012 WL 2396873, at *13 ("The parties remain free to coordinate discovery requests and depositions as they see appropriate, and apply to the Court for relief as circumstances require. Severance assures that to the extent discovery disputes arise in the context of individual plaintiffs, they can be resolved without delaying proceedings for the remaining plaintiffs.")

The Court therefore concludes that requiring Plaintiffs to proceed independently "will allow the parties to better articulate their individualized claims and defenses, which will ultimately foster swifter resolution for all involved." *See id.*

### III.    Severance under Rule 21

The remedy for misjoinder is severance, not dismissal of an action. *See* Fed. R. Civ. P. 21; *see also Lee v. Cook Cnty.*, 635 F.3d 969, 971 (7th Cir. 2011) ("When a federal civil action is severed, it is not dismissed."). The Seventh Circuit has held that the district court is "duty-bound" to prevent misjoinder from "lead[ing] to a dismissal with statute of limitations consequences[.]" *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000). Thus, the Court must allow the severed claims "to continue as [] separate suit[s] so that [they will] not be time-barred." *Id.* at 1012; *see also Lee*, 635 F.3d at 971 ("[T]he severed claims proceed as if suits had been filed separately.").

Accordingly, the claims brought by the first-named Plaintiff in the second amended complaint, Daryl Adkins, shall remain before this Court. The claims of the remaining 81 Plaintiffs are severed from this case; they will be treated as separate suits and assigned separate docket numbers. *See Lee*, 635 F.3d at 971; *Ashman v. Winnebago*, No. 11 C 50388, 2012 WL 6052238, at *5 (N.D. Ill. Dec. 5, 2012) ("The clerk is ordered to sever the claims of [two plaintiffs] from this case, to treat the claims of each of these plaintiffs as separate actions, and to assign separate docket numbers to each of those actions."); *McDowell*, 645 F. Supp. 2d at 697 (same). The Court will afford Plaintiffs a reasonable opportunity of 120 days to file separate amended complaints containing only their claims. If a plaintiff fails to file an amended complaint, that particular plaintiff's case will be dismissed.

**CONCLUSION**

For the foregoing reasons, Illinois Bell's motion to dismiss the second amended complaint for misjoinder and to sever (R. 115) is GRANTED. The Clerk of the Court is directed to sever the claims of all the Plaintiffs except Adkins from this case, and to assign separate docket numbers to each of those actions. Plaintiffs are directed to file separate amended complaints containing only their claims on or before July 30, 2015. The severed Plaintiffs must pay the applicable filing fee when they file their amended complaints. Failure to file an amended complaint will result in dismissal of that Plaintiff's case.

The parties are also requested to fully exhaust all remaining settlement possibilities for the Adkins case, as well as the severed cases, prior to this Court's next status hearing, which will be held in open court on April 29, 2015, at 9:45 a.m.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: March 24, 2015**